E-FILED
Tuesday, 30 March, 2021  01:45:53 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

JOSHUA P. SPENCER,                )
                              )
    Plaintiff,   )
                              )
    v.           )    Case No. 20-cv-3028
                              )
ANDREW SAUL,                      )
Commissioner of Social Security,  )
                              )
    Defendant.   )

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Joshua P. Spencer appeals from the denial of his application for Social Security Disability Insurance under Title II of the Social Security Act and his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Spencer filed a Motion for Summary Judgment (d/e 15).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 18).   Spencer then filed Plaintiff's Reply to Commissioner's Memorandum in Support of Motion for Summary Judgment (d/e 19).  The parties consented to proceed before this Court.

Consent to the Exercise of Jurisdiction by a United States Magistrate Judge

and Reference Order entered February 18, 2020 (d/e 9).  For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

## STATEMENT OF FACTS

### Background

Spencer was born on November 25, 1977.  He completed high school and previously worked as an electroplating laborer and a sandblaster.  He alleged that he became disabled on April 7, 2017 (Onset Date) and last worked on the Onset Date April 7, 2017.  Spencer suffered from degenerative changes in the lumbar spine status post hemilaminectomy and facetectomy and discectomy with failed back syndrome.  Certified Copy of Transcript of Proceedings before the Social Security Administration (d/e 12) (R.) 19, 21, 27, 47, 50, 60.

### Evidence Submitted Before the Evidentiary Hearing

On December 14, 2016, Spencer saw nurse practitioner Lisa Henderson, F-NP, to establish care.  R. 383-86.  He reported low back pain for many years that was getting worse.  Spencer worked for a plating / sandblasting company and the job involved "a lot of lifting."  The pain was worse in the last three weeks.  R. 383.  On examination, Spencer was uncomfortable due to pain and in mild distress.  He had full range of motion in his back with no tenderness.  His cervical spine and lumbosacral spine

were normal.  Henderson prescribed a muscle relaxant Tizanidine and a

nonsteroidal pain reliever (NSAID) Diclofenac for his back pain.  R. 385.

On January 4, 2017, Spencer saw nurse practitioner Henderson to

follow up on x-rays of Spencer's lumbosacral spine.  Henderson stated that

the x-rays were "essential negative with mild degenerative changes."  On

examination, Spencer had a normal cervical and lumbosacral spine with full

range of motion.  Henderson noted pain with palpation of the low back on

the right and left.  R. 387-88.

On January 18, 2017, Spencer again saw Henderson.  His back pain

had increased and the Tizanidine helped with the pain, but the Diclofenac

did not.  R. 390.  On examination, Spencer was in mild distress.  He had a

normal cervical and lumbosacral spine with full range of motion and no

tenderness.  He had normal strength, tone, and reflexes.  Henderson

changed the Tizanidine dosage and switched Spencer to a Diclofenac gel.

She encouraged him to consider physical therapy.  R. 391-92.

On February 24, 2017, Spencer went to the emergency room with

right side low back and posterior leg pain.  The pain was sharp and he

rated the pain at 8/10.[1]  It was worse with movement.  He reported no relief

---

[1] The 8/10 symbol means Spencer rated his pain on a 10-point scale in which 10 is the worst pain possible.  The Court uses this symbol n/10 for pain rating in which n is Spencer's rating of his pain on a 10-point scale.

from the muscle relaxant and NSAID medication.  He had no numbness, tingling, or weakness. R. 403.  On examination, Spencer had no apparent distress, his back was nontender, his strength was intact, and he had normal range of motion. He had no muscle weakness or sensory deficit.  R. 405-06.  A CT scan of his lumbar spine showed disc pathology at L4-5 and L5-S1 possibly with impingement on the nerve roots.  R. 409.  A CT scan of the abdomen and pelvis showed no neural foraminal narrowing or bony spinal canal stenosis, but paracentral disc protrusion at L4-L5 causing moderate spinal canal stenosis and probable bilateral foraminal stenosis. R. 410.  Spencer was given morphine at the emergency room and was discharged with a prescription for Norco 5-325 (hydrocodone / acetaminophen 5-325mg).  R. 411-12.

On March 15, 2017, Spencer saw Dr. Tolulope Efam, M.D., to establish care as a new patient. R. 469-72.  Spencer reported that he had had low back pain for five years and the pain was worse in the last three months.  He rated his pain as 10/10 without pain medication and 5-6/10 with.  He reported numbness and weakness in the right leg for the prior two to three weeks and said that he was awake at night due to the pain.  R. 469.  On examination, Spencer appeared to be in pain, had a stooping gait, and was limping to the right.  His range of motion in his back was restricted

and painful in all directions.  His straight leg raising test was positive.[2]  Dr. Efam assessed low back pain probably due to spinal stenosis, prescribed ibuprofen 800 mg three times a day, and renewed Spencer's Norco prescription.  Dr. Efam ordered an MRI of Spencer's lumbar spine.  R. 471.

On March 17, 2017, Spencer had an MRI of his lumbar spine which showed a large right subarticular disc herniation/extrusion at L4-L5 affecting the traversing right-sided nerve roots, extension of some disc material into the right L4-L5 neural foramen with encroachment exiting L4 nerve root, and a smaller left subarticular/foraminal herniation at L5-S1.  R. 382.

On March 18, 2017, Spencer went to the emergency room with chronic back pain.  He said that ten days ago, he started having numbness in his right leg up to his hip and estimated his pain at 10/10.  Movement aggravated the pain.  R. 421.  On examination, Spencer was in no apparent distress, his back had misalignment or step-offs noted on palpation, and he had tenderness in the right paraspinal area radiating to the hip.  He had normal range of motion and strength in his extremities.  He could rotate his trunk, bend forward and backward with good range of

---

[2] Straight leg raising test is a test for lumbar radiculopathy. Dorland's Illustrated Medical Dictionary, at https://www.dorlands.com (Dorland's) keyword "test," viewed December 16, 2020.

motion, stand on his tiptoes and heels, and balance on each foot.  Leg lift

test was negative and sensation was intact in the lower extremities.  R.

423.  He was prescribed a Medrol Dosepak of steroid anti-inflammatory

medication.  R. 423-24.

On March 22, 2017, Spencer saw Dr. Efam to discuss the March 17,

2017 MRI results.  Spencer reported continued low back pain and stiffness

that radiated to his right leg with numbness in his right leg.  He reported

that hydrocodone, Flexeril, a back brace, and heat relieved some of the

pain.  Work and walking aggravated the pain.  R. 461.  On examination,

Spencer was in no acute distress, had an abnormal gait that included

stooping and limping, and had restricted and painful range of motion in his

lower back.  R. 462.  Dr. Efam renewed his prescriptions and referred him

to an orthopedist.  R. 465.

On March 27, 2017, Spencer saw orthopedist Dr. Frank Bender, M.D.

Spencer rated his pain at 10/10 in his low back and down his right leg.  The

pain was worse with walking, using stairs, sitting, standing, and

weightbearing.  He had numbness and tingling down his right leg. R. 491.

On examination, Spencer was in no acute distress, had no pain on

palpation to his lumbar spine and SI joints, and his sensation was intact.

Patrick's maneuver was negative.  Lesegue's maneuver was positive on

the right.[3]  He had normal strength throughout his lower extremities except for right L5 proximally and distally.  He was alert and cooperative with a euthymic mood and congruous affect.  Dr. Bender found that Spencer had right lumbar radiculopathy and lumbar herniated disc.  He stated that Spencer had "weakness with pain and had pathology consistent with right L5 radiculopathy."  Dr. Bender referred Spencer to a spine surgeon.  R. 492.

On March 29, 2017, Spencer saw spine surgeon Dr. Timothy Van Fleet, M.D.  The pain was in Spencer's right hip and right buttock.  He had constant pain for two months and rated it at 10/10.  He reported numbness and weakness in the right leg.  R. 487.  On examination, Spencer was alert, cooperative, and in no acute distress.  He had an antalgic gait[4] and weakness in his right foot.  Straight leg testing was positive on the right.  R. 487.  Dr. Van Fleet discussed surgical options with Spencer and stated that after surgery, Spencer would need to avoid lifting more than 10 pounds for at least six weeks.  Spencer agreed to proceed with the surgery.  R.  488.

On April 4, 2017, Spencer saw Dr. Efam.  The appointment was scheduled as a preoperative visit, but his insurance would not approve

---

[3] Patrick's maneuver is a test for arthritis of the hip.  Lesegue's maneuver is the straight leg raising test. Dorland's, keyword "test," viewed December 16, 2020.

[4] Antalgic gait is a gait that develops as a way to avoid pain while walking. https://www.statpearls.com "Antalgic Gait in Adults" viewed March 29, 2021.

coverage of the surgery.  He reported continuing low back pain and stiffness, with pain that radiated into his right leg.  R. 591.  On examination, Spencer was in no acute distress and had a stooping, limping gait.  Dr. Efam planned to contact the insurance company.  R. 592-93.

On April 7, 2017, the Onset Date, Spencer went to the emergency room complaining of worsening back pain.  He reported that he lifted a 70-pound bucket of steel tubing at work that day, and he "felt his back hunch over."  He felt increased pain thereafter and continuing numbness in his right foot.  R. 426.  On examination, Spencer was in no apparent distress and straight leg raising tests were negative.  He had diminished strength in his right lower extremity.  R. 429.  A CT scan showed disc pathology at L4-5 and L5S1 with nerve root impingement and stenosis.  R. 430.  The emergency room provider renewed Spencer's Norco prescription and told him to follow up with Dr. Van Fleet's office.  R. 431.

On April 14, 2017, Spencer went to see nurse practitioner Henderson.  He told Henderson that Dr. Efam was now his primary care physician and asked for his records to be sent to Dr. Efam.  R. 393.  On examination, Spencer was in mild distress and had full range of motion in his back with no tenderness.  Henderson recommended physical therapy, back exercises, and ergo training for work.  R. 394-95.

On April 25, 2017, Spencer went to see Dr. Efam for a preoperative evaluation.  He reported continued back pain and stiffness with radiation into his right leg and that he still had difficulty walking.  R. 455. On examination, Spencer was in no acute distress, had a stooping gait with limping on the right, and his sensation was normal.  R. 456-57.

On May 1, 2017, Dr. Van Fleet performed back surgery on Spencer, a right L4-L5 hemilaminectomy, partial medial facetectomy, and discectomy.  R. 438-39.

On May 25, 2017, Spencer saw Dr. Efam to ask about pain management.  Spencer reported that he was doing well after his surgery. His pain was down about 50 percent, but he still had low back pain and right leg numbness.  Dr. Van Fleet told Spencer that there was some nerve damage in his right leg that may be permanent.  Spencer asked for a referral to a pain clinic and also reported that he was worried about his job because he was on a 10-pound lifting limit.  He was on medical leave from work at the time.  R. 452.  On examination, he was in no acute distress, his surgical scar was healing well, and he was limping to the right.  Dr. Efam renewed his muscle relaxant prescription and told Spencer that a referral to a pain clinic was not warranted at this time.  He told Spencer to tell Dr. Van Fleet about his continued pain.  R. 454.

On June 14, 2017, Spencer saw Dr. Van Fleet.  Spencer reported continued low back pain and right leg numbness and rated his pain at 7/10. On examination, Spencer was in no acute distress.  Dr. Van Fleet observed that Spencer's condition improved and noted that Spencer walked with a cane.  Dr. Van Fleet stated that Spencer was doing well and could resume regular activities, and ordered physical therapy.  R. 482.

On June 21, 2017, Spencer saw the physical therapist for evaluation. He reported low back pain and right leg pain, numbness, and tingling.  He indicated some improvement in his symptoms after his surgery.  R. 497. On examination, Spencer stood with his weight shifted to the left leg, his range of motion in his lumbar spine was reduced as well as rotation of his trunk.  He had pain with palpation of his thoracolumbar spine, bilateral iliopsoas, and, along the sciatic nerve, had positive straight leg raising tests and a positive slump test.  His sensation and reflexes were normal. He could balance on his left leg, but not on his right.  Spencer had an antalgic gait which improved when the therapist provided cues for use of his cane. 498-99.  The therapist gave Spencer home exercises and set up a schedule for two physical therapy sessions per week for six weeks.  R. 500.

On July 31, 2017, Spencer completed the six-week course of physical therapy.  He reported, "feeling much stronger, having better mobility, and

ability to walk better without a cane, but notes that the numbness in his right foot persists."  Spencer's right leg got worse as the day progressed. He could walk without an assistive device in the morning, but his right foot "wants to drag more" as the day went on.  Spencer estimated he made 60-70 percent improvement during the six weeks of therapy.  R. 528.  On examination, Spencer's range of motion in his back improved, but his lumbar flexion and extension were still limited.  He denied significant symptoms with thoracolumbar motion except for mild discomfort at the end of his range extension.  He had pain on palpation to his iliopsoas and in his right calf, and along the right sciatic nerve.  Straight leg raising tests were better but still showed some limitations.  His ability to balance on his right foot improved but was still abnormal, his gait was minimally antalgic, and he was able to lift 20 pounds from floor to waist with cues from the therapist.  Overall, the therapist determined that Spencer met four of his five goals and demonstrated independence in performing the home exercise program; he reported 3/10 pain with activity; he demonstrated improved range of motion of the thoracolumbar spine; and he showed improved strength.  R. 530.  The therapist recommended six more weeks of therapy to work on lower extremity and core strengthening, and to add job simulation as tolerated.  R. 530-31.

On August 9, 2017, Spencer saw Dr. Van Fleet.  He reported continued lower back pain on the right and left, but had no leg pain, and rated his pain at 5/10.  On examination, Spencer was in no acute distress, his incision was healed, and he was able to walk without an assistive device.  Dr. Van Fleet found that he had improved and added that Spencer was "doing well."  He needed to continue the home exercise program.  Dr. Van Fleet released Spencer to work with no restrictions.  R. 479.

On September 27, 2017, Spencer saw Dr. Van Fleet.  He reported that most of his pain was back and he had numbness in his left leg. He rated his pain at 7/10 and said moving made the pain worse.  He was taking ibuprofen, but it was not helping, and he did some of the exercises from his physical therapy.  On examination, Spencer was in no acute distress, his mood and affect were euthymic, and he could ambulate without an assistive device.  He had difficulty with flexion and could not perform extension of his spine.  An x-ray showed a "little bit of narrowing at the L4-5 and L5-S1 disc space."  R. 476.  Dr. Van Fleet prescribed NSAID pain relievers and physical therapy.  R. 477.

On November 1, 2017, Spencer completed a Function Report—Adult form (Function Report).  R. 240-47.  He lived in a house with his family.  He could not work because he could not "sit, stand, or walk for long periods

without major pain."  He did not lift weights because he did not "want to blow out more discs."  R. 240.  On a typical day, Spencer got up, let the dogs out, and took care of his personal hygiene.  He helped his wife with chores including vacuuming, dishes, and taking out the trash.  He also mowed the lawn with a riding mower and estimated that each of these chores took 10 to 20 minutes.  He occasionally walked the dogs around the yard.  The pain sometimes kept him up at night.  He had no problems performing his personal care and dressing himself and he helped prepare meals, "making sandwiches mostly" two to three times per week.  R. 241-42.  He went outside three times a day.  He both drove and rode in a car and went grocery shopping "once every couple of months."  Each trip took about 20 minutes.  R. 243.  He watched baseball and read daily.  He could not sit for more than 20 minutes at a time as he then had to move around and stretch.  He went to church on Sunday unless he was in too much pain.  R. 244.

Spencer said that his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs.  He could walk for 20 minutes at one time, but had to rest for 20 minutes before resuming.  He could pay attention for long periods of time and he could follow instructions well.  He got along with authority figures and handled stress and changes

in routine well.  R. 245-46.  He used a cane and back brace before his surgery.  At the time of the Function Report, he could walk without a cane. R. 247.

On December 15, 2017, state agency physician Dr. Richard Bilinsky, M.D., prepared a Physical Residual Functional Capacity Assessment of Spencer.  R. 97-99.  Dr. Bilinsky opined that Spencer could occasionally lift 20 pounds and frequently lift 10 pounds; sit and/or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently use foot controls; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance, kneel, crouch, and crawl; occasionally stoop; and should avoid concentrated exposure to vibration and hazards.  R. 97-98.

On January 10, 2018, Spencer saw Dr. Efam to discuss options for his back and nerve pain.  He reported continued back pain but mild improvement in the pain.  He also had pain in his right foot, but he no longer needed the cane to walk.  He said Dr. Van Fleet told him that his right foot would be numb for some time.  He was taking ibuprofen for the pain, but it was not helping much.  R. 581.  On examination, Spencer was in no acute distress, his gait and station were normal, he had pain in his

lumbar spine with palpation, and straight leg raising tests were positive.  Dr. Efam referred Spencer to a neurologist and a pain clinic.  R. 583.

On January 25, 2018, Spencer saw pain specialist Dr. Ferdinand Salvacion, M.D.  Spencer said he could walk without a cane and rated his pain at 8/10.  He described his pain as throbbing, numbing, and aching.  It was better lying in a fetal position and worse standing or sitting for too long.  He had completed 12 weeks of physical therapy.  R. 564.  On examination, Spencer was calm and in no acute distress, his straight leg raising tests were positive bilaterally, and his gait was stiff and painful.  He favored his right leg.  His lumbar spine was tender to palpation and he had limited range of motion in his back and decreased sensation in his right lower extremity.  Dr. Salvacion assessed lumbar foraminal stenosis, lumbar radiculopathy, and lumbar degenerative disc disease. He discontinued Spencer's use of ibuprofen, prescribed gabapentin and Diclofenac, and ordered another MRI.  R. 565.

On January 31, 2018, Spencer had an MRI of his lumbar spine.  The MRI showed postoperative changes at L4-L5, mild canal stenosis, no foraminal stenosis, and some "enhancing epidural scar along the right L5 nerve root."  The MRI also showed at L5-S1 a "mild diffuse disc bulge and osteophyte with small central protrusion component."  The protrusion

abutted the S1 nerve roots, right greater than left.  Spencer had no

foraminal stenosis at L5-S1 and no significant interval change since the

prior imaging.  R. 567.

On January 31, 2018, Spencer saw neurologist Dr. Jigar Mankad,

M.D. for right foot numbness and pain.  He could walk without an assistive

device with a limp, and reported numbness, cold, and burning symptoms in

his right foot.  He had not felt much difference since starting the

gabapentin.  Spencer's wife stated that Spencer could not put on his shoes

and tie them well by himself.  Dr. Mankad "discussed about slow re-growth

of the nerve and difficult (sic) to predict if his symptoms would completely

reverse or not."  R. 521.  On examination, Spencer was in no acute

distress, had 5/5 strength in his upper extremities, and 4+/5 strength at HF

and 5/5 strength otherwise in his left lower extremity.  His right lower

extremity showed 4-/5 strength at HF, 4/5 strength at KF and KE,

weakness with hip flexion and knee extension related to his low back pain

limiting strength, 4-/5 strength in his plantar dorsiflexion, and 4/5 strength

with his plantar flexion.[5]  Spencer had normal muscle tone with no atrophy

and his sensation was intact to light touch but reduced to vibration sense

---

[5] Neither the record nor the parties define the abbreviations HF, KF, and KE.  The Court surmises the term HF means hip flexion; the term KE means knee extension, and the term KF means knee flexion.

and temperature sense at his right great toe and between first and second toe of his right foot.  Spencer's coordination was intact, he had an antalgic gait related to back pain, and had difficulty tandem walking.  Dr. Mankad ordered a nerve conduction and electromyography (NCV/EMG) study.  He told Spencer to keep taking the gabapentin and that he could switch to Cymbalta or Lyrica if the gabapentin did not provide relief.  R. 523-24.

On February 7, 2018, Spencer saw Dr. Salvacion.  He rated his pain at 8.5/10 and reported no relief from Diclofenac or Lyrica.[6]  On examination, Spencer was calm and in no acute distress and favored his right leg while ambulating.  Dr. Salvacion reviewed the January 31, 2018 MRI with Spencer, recommended lumbar epidural injections, and referred Spencer for aquatic therapy.  Dr. Salvacion also increased the Lyrica dosage and added tramadol.  R. 567.

On February 8, 2018, Dr. Salvacion administered a lumbar transforaminal epidural steroid injection under fluoroscopy to Spencer's L5 nerve root foramen (epidural injection).  Spencer tolerated the injection without complications.  R. 568.

On February 22, 2018, Spencer saw Dr. Salvacion.  He did not receive much relief from the epidural injection and said that Dr. Van Fleet

---

[6] The record does not indicate how Spencer received a prescription for Lyrica at this time.

told him further surgery would not relieve his pain and might cause more pain.  Spencer rated his pain at 8/10 and said he did not get the referral for aquatic therapy.  On examination, Spencer was calm and in no acute distress.  He sat quietly in the examination chair.  Dr. Salvacion prescribed tramadol and scheduled a second epidural injection.  R. 569-70.  On February 23, 2018, Dr. Salvacion administered another epidural injection to Spencer.  R. 577.

On March 9, 2018, Spencer saw Dr. Salvacion.  He reported no relief from the second epidural injection and rated his pain at 9/10. On examination, Spencer was calm and in no acute distress.  His gait was stiff and painful.  Dr. Salvacion prescribed Norco 10/325.  R. 578-79.

On March 26, 2018, Spencer underwent the NVC/EMG study.  The NVC study showed normal results in Spencer's bilateral lower extremities.  The EMG study showed subtle changes consistent with L5 and/or S1 radiculopathy.  R. 516.

On the same day, March 26, 2018, Spencer also saw Dr. Mankad who reviewed the NVC/EMG study and said the study was suggestive of mild old radiculopathy.  Dr. Mankad said that it was hard to predict whether Spencer would recover from these symptoms and discussed failed back surgery syndrome and told Spencer to continue taking the Lyrica and

Norco.  R. 604.  On examination, Spencer was in no apparent distress and had 5/5 strength in his upper extremities.  The left lower extremity had 4+/5 strength at HF, and 5/5 strength otherwise.  The right lower extremity had 4-/5 strength at HF, 4/5 at KF and KE, normal hip abduction, weakness with hip flexion and knee extension related to low back pain, plantar dorsiflexion 4-/5 and 4/5 plantar flexion.  Spencer had normal tone and no atrophy, his light touch sensation was intact, and his vibration sense and temperature sense were reduced at the right big toe and between first and second toe on his right foot.  He had an antalgic gait and had difficulty tandem walking.  R. 605.  Dr. Mankad gave Spencer a prescription for Lyrica and stopped the gabapentin prescription.  R. 606.

On April 10, 2018, Spencer saw Dr. Salvacion.  Spencer rated his pain at 8/10 and said the Norco did not help with the pain.  He occasionally took Lyrica with Norco "to help ease the pain." He did not take the Lyrica as often as prescribed.  R. 639.  R. 639.  On examination, Spencer was calm and in no acute distress, and his gait was stiff and painful in a stooped position.  Dr. Salvacion increased the dosage of Norco, added additional Tylenol, told Spencer he could take ibuprofen for breakthrough pain, and instructed Spencer to take the Lyrica every day as prescribed.  R. 640.

On May 30, 2018, state agency physician Dr. Charles Kenney, M.D., prepared a Physical Residual Functional Capacity Assessment of Spencer. R. 110-12.  Dr. Kenney opined that Spencer could occasionally lift 20 pounds and frequently lift 10 pounds; sit and/or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently use foot controls; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance, kneel, crouch, and crawl; occasionally stoop; and should avoid concentrated exposure to vibration and hazards.  R. 111-12.

On July 2, 2018, Spencer saw Dr. Salvacion.  He reported his pain was about the same and Norco and Lyrica did not provide relief.  On examination, Spencer was in no acute distress, his gait was stiff and painful, and he favored his right leg when he walked.  Dr. Salvacion assessed lumbar spondylosis, lumbar radiculopathy, status post lumbar laminectomy, failed back surgery syndrome.  Dr. Salvacion continued his prescriptions and discussed the possibility of changing prescriptions in three months.  R. 657.

On August 1, 2018, Spencer saw Dr. Salvacion.  He had started a trial of extended release morphine which caused headaches and urinary retention.  He reported that he did not get relief from Norco and he could

not try a fentanyl patch because of his insurance.  He rated his pain at 8/10.  On examination, Spencer was calm and in no acute distress.  He was sitting quietly in a chair.  Dr. Salvacion discontinued the morphine and started Spencer on a trial of Percocet (oxycodone/acetaminophen).  R. 659-60.

On August 30, 2018, Spencer saw Dr. Salvacion.  The Percocet did not work as well as the morphine to relieve pain but did not cause adverse side effects.  He reported doing well on the Lyrica but still experiencing "a bit of numbness and tingling."  He rated his pain at 8/10.  On examination, Spencer was calm and in no acute distress and his gait was stiff.  Dr. Salvacion adjusted the Percocet and Lyrica dosages.  R. 661-62.

On September 24, 2018, Spencer saw Dr. Mankad.  He reported numbness and pain in his right foot, soreness, paresthesia in the form of pins and needles sensation, heaviness, and weakness in his upper extremities.  He continued to have chronic back pain.  R. 653.  On examination, Spencer was in no apparent distress and could move all his extremities without any focal weakness.  His left lower extremity had 4/5 strength at HF, and 5/5 strength otherwise.  His right lower extremity 4-/5 strength at HF, 4/5 at KF and KE, some pain driven weakness in his hip, and 4-/5 strength in his plantar dorsiflexion and 4/5 strength in his plantar

flexion.  He had normal muscle tone and no atrophy, his sensation was intact to light touch, his gait was antalgic, and he had difficulty tandem walking.  Dr. Mankad planned an NVC/EMG of Spencer's upper extremities.  He told Spencer to continue taking the Lyrica as prescribed. R. 655.

On September 26, 2017, Spencer saw nurse practitioner Sarah Sloan, FNP-BC, in Dr. Salvacion's office.  He was "doing reasonably well with the Lyrica and Percocet and he could perform more daily activities.  He denied any adverse effects from the medication and rated his pain at 8/10. On examination, Spencer's gait was stiff and painful and he favored his right leg while walking.  Sloan reiterated Dr. Salvacion's impression of lumbar spondylosis with radiculopathy, status post laminectomy, and failed back surgery syndrome.  R. 663.  She renewed Spencer's prescriptions.  R. 664.

On November 1, 2018, Spencer saw Dr. Mankad.  Dr. Mankad had secured an NVC/EMG of Spencer's upper extremities.  The studies showed no evidence of neuropathy or radiculopathy, no evidence of carpal tunnel syndrome, and no evidence of cubital tunnel syndrome.  Dr. Mankad also noted that Spencer was applying for disability and stated that Spencer probably would not be able to return to his prior work.  R.  684.  Dr.

Mankad's examination of Spencer was substantially similar to the September 24, 2018 examination.  R. 685.  Dr. Mankad stated that Spencer's symptoms in his upper extremities had improved and told him to continue taking the Lyrica as prescribed.  R. 685.

On December 19, 2018, Spencer saw Dr. Salvacion.  His pain was managed better, but he still had severe pain that affected his activities.  He rated his pain at 8/10.  On examination, Spencer was calm and in no acute distress and his gait was stiff.  He brought in his Percocet medicine and a count of the pills confirmed that he was taking the medicine as prescribed.  R. 710.

On January 2, 2019, Spencer saw nurse practitioner Sloan in Dr. Salvacion's office.  Dr. Salvacion had recommended a trial of extended release oxycodone, but Spencer's insurance had denied coverage.  He also did not try a fentanyl patch because his insurance denied coverage.  He reported he was doing well with the Percocet, but his activities were "quite limited."  He rated his pain at 8/10 and said he had no side effects from the medication.  On examination, he was calm and in no acute distress; his gait was stiff and somewhat stooped.  R. 707.  Sloan increased his Percocet to five pills per day.  R. 708.

On January 22, 2019, Dr. Mankad prescribed a wheeled walker with seat for Spencer for his balance problems.  R. 701.

On February 6, 2019, Spencer saw nurse practitioner Sloan in Dr. Salvacion's office.  By this visit, Spencer had started using extended release oxycodone.  The pain was more tolerable, and he decreased the number of Percocet pills he was taking.  He noticed some sleepiness, but "it was not too bothersome."  Lyrica also caused some sleepiness, but it had helped ease his pain in his right leg and foot.  He rated his pain at 8/10.  On examination, Spencer was calm and in no acute distress, his gait was somewhat stiff, and he favored his right leg.  Sloan refilled Spencer's prescription.  R. 703-04.

### The Evidentiary Hearing

On February 22, 2019, an Administrative Law Judge (ALJ) conducted an evidentiary hearing in this case.  R. 40-83.  Spencer appeared with his attorney.  Vocational expert Kathleen Mueller also appeared.  R. 42. Spencer testified that he lived with his wife in a one-story house with a basement.  R. 48-49.  He worked as a metal plater and had to lift heavy sheets of metal in and out of different vats to clean and plate the metal.  R. 53.  He also worked as a sandblaster.  R. 55-57.  The heaviest objects he lifted weighed 130 pounds.  R. 53.

Spencer said he could not work because of the constant pain.  He was not able to concentrate because of the pain in his lower back and right leg which never went away. He had numbness and constant throbbing pain.  R. 59-60.

Spencer testified that his surgery allowed him to stand more upright and stop dragging his right leg when he walked.  R. 60-61.  The surgery and physical therapy relieved his pain somewhat, but he was still in pain. He stated that his pain "averages between eight and ten" on a scale of one to 10.  Dr. Van Fleet told Spencer that any more surgery would just cause more pain.  R. 61.  Epidural injections did not help the pain at all.  The Percocet and extended release oxycodone together "brings the pain from down from a ten to an eight."  R. 62.  Even on the two medications, Spencer's pain varied from 8/10 to 10/10.  The medication made Spencer very drowsy and he described the drowsiness as "Spacing out, dazing off." R. 62-63.  He could not "concentrate on nothing" when he took the pain medication as prescribed.  R. 76.

Spencer said he used both a walker and a cane to walk.  He used the walker at home in the mornings for about two hours until he was able to straighten up his back then used a cane for balance when he left the house.  R. 63-65.  He could not walk far without his cane because he would

lose his balance and fall.  Spencer testified that he needed the cane to walk and also needed his wheeled walker, but he did not use it outside the house because using the walker made him feel old.  R. 73.

Spencer's wife cooked meals and he occasionally made sandwiches or put something in the microwave oven.  Sometimes he went grocery shopping with his wife, but she did most of the shopping.  He tried to wash dishes once, but he regretted doing so because his efforts at dishwashing caused severe pain.  His wife did the other household chores, except he did a little vacuuming.  R. 68.  He mowed the lawn using a riding mower. Mowing took a couple of hours because his home sat on three lots and because he had to stop and rest often because the mower shook him up and he could not sit for too long.  Before he got hurt, Spencer mowed the yard on the riding mower in 20-30 minutes.  His wife did all trimming outside.  R. 68-69.

In a typical day, he got up, read the Bible, and let out the dogs.  He sometimes went outside with the dogs.  Then he showered, ate breakfast, and turned on the television.  He spent a significant amount of time on Facebook.  R. 70-71.  He often fell asleep on the couch during the day because his pain interfered with his sleep at night and his medications made him drowsy.  R. 72.

Spencer used to go fishing, but he had gone not in a while.  He guessed that he could go fishing now, but it would be "very difficult."  He could throw the line out, but would not be able to reel in a fish.  R. 74-75.  He attended family get togethers and the family generally came to his house for holiday gatherings.  Spencer occasionally went to church which met about a block from his house.  R. 70-72.

Spencer estimated that he could be up on his feet either standing or walking for 15 to 20 minutes at a time and he could sit for 30 minutes.  R. 66.  Spencer said that "[i]t's doing everything in me" to sit during the hearing.  R. 76.  He could not work a job in which he had no option to change positions because of his pain and his inability to concentrate, "In my state, sir, I could give [a job] five percent maybe, and that's if I could concentrate enough on-the-job and I'm – the task that I'm given, and I can't concentrate on nothing, sir."  R. 77.

Spencer opined that he could lift 10 pounds.  He explained, "I mean I could probably lift up more than that, sir, I just don't want to blow out more herniated discs."  He said that he could possibly lift 20 pounds.  R. 66.  He could not work for long at a job that required him to lift 20 pounds.  R. 74.

Vocational expert Mueller then testified.  The ALJ asked Mueller the following hypothetical question:

Okay. I'd like you to consider a hypothetical for us. I'd like you to consider a younger individual who has completed 12 grades of education, and has the same past relevant work as we've just identified.

Our hypothetical individual retains the ability to do light work, but this individual can only frequently climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds.

This individual can frequently balance, kneel, crouch, and crawl, can occasionally stoop. This individual must avoid concentrated exposure to vibration, and hazards such as moving machinery, and unprotected heights.

If I stop there, can our hypothetical individual perform any of the past relevant work?

R. 79.  Mueller opined that such a person could not perform Spencer's prior work as a metal plate laborer or sandblaster.  Mueller said that the person could perform other jobs that existed in the national economy such as: office helper with 35,000 such jobs in existence nationally; light laborer with 21,000 such jobs in existence nationally; call-out operator, with 41,000 such jobs in existence nationally; address clerk, with 12,000 such jobs in existence nationally; and circuit board assembler, with 34,000 such jobs in existence nationally.  R. 80.

The ALJ then asked Mueller:

And what if I add to this hypothetical that this individual must use a cane held in the right dominant hand for any ambulation that's necessary with the free hand available for any lifting or carrying that may be necessary, can both the light and sedentary jobs still be done?

R. 81.  Mueller said that such a person could still perform the call-out

operator, address clerk, and circuit board assembler jobs, but not the

others jobs she had identified.  R. 80-81.  Mueller said that this person

could perform these jobs even if he needed to use a wheeled walker to

ambulate.  Mueller explained that these jobs were performed seated and

had no requirement to carry objects.  R. 81-82.  Mueller said the person

could not work if he was off-task 20 percent of the workday.  R. 81.

## THE DECISION OF THE ALJ

On April 2, 2019, the ALJ issued his decision.  The ALJ followed the

five-step analysis set forth in Social Security Administration Regulations

(Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the

claimant not be currently engaged in substantial gainful activity.  20 C.F.R.

§§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a

severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3

requires a determination of whether the claimant is so severely impaired

that he is disabled regardless of his age, education and work experience.

20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3,

the claimant's condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Spencer met his burden at Steps 1 and 2.  He had not engaged in substantial gainful activity since the Onset Date, and he suffered from the severe impairments of degenerative changes in the lumbar spine status post hemilaminectomy and facetectomy and discectomy with failed back syndrome.  At Step 3, the ALJ found that

Spencer's impairments or combination of impairments did not meet or

equal any Listing.  R. 21-22.

The ALJ then determined Spencer's RFC in order to address Steps 4

and 5.  The ALJ determined that Spencer had the following RFC:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform light work as defined in 20 CFR 404.1567(b) and
> 416.967(b) except can only frequently climb ramps and stairs;
> never climb ladders, ropes and scaffolds; frequently balance,
> kneel, crouch and crawl; occasionally stoops; must avoid
> concentrated exposure to vibration and hazards such as
> moving machinery and unprotected heights; must use a cane
> held in the right, dominant hand for any ambulation that is
> necessary with the free hand available for any lifting and
> carrying that may be necessary.

R. 22.  In making this finding, the ALJ relied on evidence that the surgery

had improved his condition, that he said he could walk with a cane, that Dr.

Salvacion consistently found that Spencer was calm and in no acute

distress at examinations, Spencer's reports that the combination of

extended release oxycodone and Percocet made his pain more tolerable,

and his report that Lyrica helped ease his pain in his right leg and foot.  In

reaching these conclusions, the ALJ summarized Spencer's medical

records in detail.  R. 23-25.  The ALJ discounted the opinions of Drs.

Bilinsky and Kenney because they did not view the medical records after

the dates of their respective RFC opinions and because they did not have

the opportunity to assess Spencer's testimony at the hearing.  R. 26.

In making his RFC determination, the ALJ found that Spencer's

testimony, his statements about the severity of his pain, and the functional

limitations caused by his pain, were not consistent with the other evidence

in the record:

> As for the claimant's statements about the intensity,
> persistence, and limiting effects of his or her symptoms, they
> are inconsistent because, although the claimant has received
> various forms of treatment for the allegedly disabling
> symptoms, and the claimant could not return to his past
> relevant work (which would normally weigh somewhat in the
> claimant's favor), the record also reveals that the treatment has
> been generally successful in controlling those symptoms well
> enough that the claimant could still perform substantial gainful
> activity. In addition, while the claimant has regularly and
> consistently alleged pain at a level of approximately "8" out of
> 10 throughout the period under consideration (and documented
> below), the contemporaneous medical record also documented
> the claimant as "calm" and "in no acute distress" (again,
> documented below in this decision). This is contrary to what
> one would expect of someone experiencing such a severe and
> sustained level of pain symptoms. The total diagnostic and
> objective evidence of record does not demonstrate findings that
> would support a finding that the claimant's impairments so
> limited the claimant's residual functional capacity that the
> claimant's occupational pace would be so reduced that the
> claimant could not perform any substantial gainful activity within
> the national economy.

R. 23.

After determining Spencer's RFC, the ALJ determined at Step 4 that Spencer could not perform his prior relevant work as an electroplating laborer or a sandblaster.  R. 27.

At Step 5, the ALJ determined that Spencer could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Mueller that a person with Spencer's age, education, work experience, and RFC could perform the representative jobs of call out operator, address clerk, and circuit board assembler.  The ALJ determined that Spencer was not disabled. R. 27-28.

Spencer appealed.  On December 11, 2019, the Appeals Council denied Spencer's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Spencer then brought this action for judicial review.

ANALYSIS

This Court reviews the decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial

evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social

Security Administration no longer uses the term credibility in the evaluation

of statements regarding symptoms).  The ALJ must articulate at least

minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence.  The

evidence that Spencer's surgery improved his condition, his testimony that

he could walk with a cane for balance, Dr. Salvacion's repeated

observation that Spencer was calm and in no acute distress, and Spencer's

reports to his doctors that the Lyrica helped with his leg pain and the

Percocet and oxycodone extended release helped relieve his back pain all

supported the ALJ's findings.

No expert medical opinions conflicted with the ALJ's findings.  Drs.

Bilinsky and Kenney opined that Spencer had greater functional ability than

the ALJ found in the RFC.  Drs. Bilinsky and Kenney both opined that

Spencer could occasionally climb ropes, ladders, and scaffolds, but the ALJ

found that he could never do these actions.  The ALJ also found that

Spencer's impairments required him to use a cane in his dominant right

hand to ambulate.  Drs. Bilinsky and Kenney did not include such

limitations in their RFC assessments.  No other healthcare provider offered

opinions that conflicted with Drs. Bilinsky and Kenney.  Dr. Van Fleet at one

point said that Spencer had no restrictions on his activities.  R. 479.  Dr.

Mankad stated that Spencer could not return to his prior work but did not

opine on whether he could perform any other types of work.  R. 684.  All

this evidence provides substantial evidence to support the ALJ's decision.

See Best v. Berryhill, 730 Fed.Appx. 380, 382 (7th Cir. 2018) ("There is no

error when there is 'no doctor's opinion contained in the record [that]

indicated greater limitations than those found by the ALJ.'") (quoting Rice v.

Barnhart, 384 F.3d 363, 370 (7th Cir. 2004).

Spencer argues that the ALJ erred in relying on Dr. Salvacion's consistent findings that he was calm and in no acute distress.  He argues that findings like a patient being calm or in no acute distress were irrelevant to evaluating the severity of Spencer's pain.  Spencer cites no legal authority for his argument.

The Court's research reveals that several District Courts in this Circuit have found that medical examination notes documenting "no acute distress" were relevant evidence in evaluating the severity of the claimant's symptoms.  See Echterling v. Berryhill, 2019 WL 1397475, at *3 (N.D. Ind. March 27, 2019) (The ALJ could rely on examination findings of no acute distress as being inconsistent with a claimant's statements of severe pain.); Pittman v. Berryhill, 2017 WL 1191226, at *11 (March 31, 2017) (The ALJ could rely on examination findings of no acute distress as being inconsistent with a claimant's statements of severe pain.); Garrett v. Berryhill, 2017 WL 3521048, at *5 (N.D. Ill. August 15, 2017) (The  ALJ's rejection of the claimant's statements about severe pain was supported by medical records in which the doctor "observed that plaintiff was in "no acute distress and exhibited normal lumbar spine range of motion" at a time when plaintiff stated his pain was "killing him."); Maxey v. Colvin, 2015 WL 5432254, at *3 (S.D. Ind. September 15, 2015) ("[T]he ALJ noted that,

Ms. Maxey 'stated that she had debilitating levels of pain, yet typically presented to examinations in no acute distress.'");  see also Auman v. Colvin, 2015 WL 9463181, at *4 (S.D. Ind. December 28, 2015) (Examination notes of no acute distress supported the ALJ's findings that a claimant's mental health treatments were effective in controlling her symptoms).

At least one District Court has disagreed, finding that examination notes of no acute distress were not relevant to evaluating a claimant's statements about chronic pain.  Barnett v. Berryhill, 2019 WL 1219544, at *5 n.4 (N.D. Ind. March 15, 2019) (The term "no acute distress" means the claimant had no "acute" or sudden onset of a severe problem.  The observation in an examination note does not say anything about the severity of symptoms from chronic conditions such as chronic back pain).

The Seventh Circuit upheld an ALJ's decision in which the ALJ relied on examination notes that a claimant was in no acute distress along with other evidence to evaluate the severity of a claimant's symptoms.  See Schaaf v. Astrue, 602 F.3d 869, 876 (7th Cir. 2010).  Given the Seventh Circuit's comments in Schaaf, the Court finds that observations in examination notes of no acute distress or similar observations are relevant evidence of a claimant's symptoms.  The ALJ could properly rely on Dr.

Salvacion's observations that Spencer was calm and in no acute distress in evaluating the severity of his symptoms.

Spencer also argues that the ALJ improperly disregarded other evidence and relied only on the examination notes findings that he was calm and in no acute distress to discount Spencer's statements about the severity of his symptoms. The cases found by the Court and cited above agree with Spencer that the ALJs in those cases did not just rely on examination notes that found no acute distress. Those ALJs relied on other evidence in addition to the findings of no acute distress. See Schaaf, 602 F.3d at 876 (other evidence showed that Percocet controlled claimant's pain); Echterling, 2019 WL 1397475, at *3 (other evidence showed that claimant had "minimal or mild issues"); Garrett, 2017 WL 3521048, at *5 (other examination findings supported the ALJ's RFC assessment); Pittman, 2017 WL 1191226, at *11 (claimant statements showed that her medication controlled her symptoms); Maxey, 2015 WL 5432254, at *3 (The claimant's statements about the debilitating effect of her pain was inconsistent with other findings in medical exams and other statements the claimant made).

The ALJ in this case also cited other evidence beyond just Dr. Salvacion's examination notes that Spencer was calm and in no acute

distress.  The ALJ relied on evidence that Spencer's back surgery improved his condition and the Lyrica, Percocet, and extended release oxycodone helped relieve his pain.  R. 23; see R. 661-62, 664, 703-04. The ALJ may give less weight to a claimant's statements about his symptoms when the statements were inconsistent with other evidence in the record, "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . ."  SSR16-3p, 2017 WL 5180304, at *8

Spencer argues that the ALJ erred by not following SSR16-3p.  The Court again disagrees.  Social Security Ruling 16-3p directs ALJs to evaluate the claimant's statements about the limiting effect of his symptoms in light of the other evidence in the record.  The ALJ complied.  The ALJ considered whether Spencer's statements about the severity of his pain were consistent with the other evidence in the records.  Contrary to Spencer's claims, the ALJ reviewed his medical records extensively in the decision.  R. 24-27.  The ALJ was not required to mention every piece of evidence in the record.  E.g., Scheck v. Barnhart, 357 F.3d 697, 700 (7th

Cir. 2004).[7]  Spencer argues that the ALJ cherry-picked the evidence.  The Court disagrees.  The evidence cited by the ALJ supported the inference that the surgery and pain medication helped relieve Spencer's pain.  The ALJ's RFC finding was also more restrictive than the medical expert opinions of Drs. Bilinsky and Kenney.  As discussed above, no expert opinion contradicted the opinions of Drs. Bilinsky and Kenney.  Given this evidence and the instruction in SSR 16-3p quoted above, the ALJ's treatment of Spencer's statements about his symptoms was not patently wrong and did not lack any explanation or support in the record.  See Pepper, 712 F.3d at 367.  The Court, therefore, will not revisit the limited weight that the ALJ gave to Spencer's statements about the severity of his pain.

Much of Spencer's argument essentially asks the Court to reweigh the evidence.  That is improper. Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82.  Given the evidence and the deference afforded an ALJ's factual findings, the Court sees no basis to overturn the ALJ's evaluation of the factual record.  As explained above, the ALJ relied on substantial evidence

---

[7] Spencer also cites in his argument evidence that Dr. Mankad signed a request for a disabled parking placard.  The request for a disabled parking placard is irrelevant because Dr. Mankad did not sign that request until September 5, 2019, several months after the ALJ made his decision. R. 12-15.  In evaluating whether the ALJ erred, the Court can only consider the evidence that was in the record before the ALJ. Farrell v. Astrue, 692 F.3d 767, 770 (7th Cir. 2012); Diaz v. Chater, 55 F.3d 300, 309 (7th Cir. 1995).

to support his decision and minimally articulated his analysis of the relevant evidence.  See Herron, 19 F.3d at 333.

Spencer also argues that the ALJ failed to consider how Spencer's need to take frequent breaks and his need to lie down would affect his ability to work full-time.  Once more, the Court disagrees.  Spencer's statements about the severity of his symptoms were the only evidence that he needed to take frequent breaks or needed to lie down.  For the reasons stated above, the ALJ did not err in discounting Spencer's statements as inconsistent with other evidence in the record.  The ALJ's decision not to give weight to Spencer's statements about these symptoms, therefore, was supported by substantial evidence.  There was no error.

Spencer also argues that the ALJ improperly cited a medical examination that did not exist.  The Court disagrees.  The ALJ erroneously referred to an examination on February 21, 2018, as an examination on February 2, 2019.  R. 25, 696-97.  The ALJ accurately summarized the information on the February 21, 2018 examination note but only made a mistake about the date.  The error was harmless.  The ALJ's decision is supported by substantial evidence.

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 18) is ALLOWED; Plaintiff Joshua P.

Spencer's Motion for Summary Judgment (d/e 15) is DENIED; and the

Decision of the Defendant Commissioner is AFFIRMED.  THIS CASE IS

CLOSED.

ENTER:   March 29, 2021

_____ s/ *Tom Schanzle-Haskins* _____

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE